**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN and the DISTRICT OF COLUMBIA, | CA No. _____3:16-2827-TLW_____ |
| Plaintiffs, | |
| *ex rel.* Respiratory Diagnostics, LLC, | |
| Plaintiff-Relator, | |
| v. | **COMPLAINT** **(Jury Trial Demanded)** |
| VirtuOx, Inc., Medical Services of America, Inc., Apria Healthcare Group, Inc., AeroCare Holdings, Inc.., Preferred Homecare, Rotech Healthcare, Inc., American HomePatient, and Norco, Inc., | |
| Defendants. | |

Plaintiff-Relator Respiratory Diagnostics, LLC files this Complaint pursuant to the federal

False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq., and analogous state false claims acts to recover

monies illegally obtained by Defendant VirtuOx, Inc. ("VirtuOx") and Defendants Medical

Services of America, Inc., Apria Healthcare Group, Inc., AeroCare Holdings, Inc., Preferred

Homecare, Rotech Healthcare, Inc., American HomePatient, and Norco, Inc. (collectively, the

"DME Suppliers"), from federal health insurance programs through an illegal kickback scheme

that incentivizes the DME Suppliers to utilize VirtuOx blood oxygen testing services in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320-7b.

Under this illegal scheme, VirtuOx provides DME Suppliers with free overnight oximetry testing equipment the DME Suppliers would otherwise be required to purchase at significant cost. Further, because VirtuOx equipment utilizes proprietary software that can only be processed through VirtuOx, the DME Suppliers are then forced to use VirtuOx independent diagnostic testing facility (IDTF) services to qualify the results, a service for which VirtuOx receives reimbursement from state and federal health insurance programs. This kickback scheme has resulted in the submission of claims for payment to public health insurance programs in violation of federal and state false claims laws.

Plaintiff-Relator would respectfully show the Court as follows:

## JURISDICTION AND VENUE

1.      This action arises under the FCA and the AKS. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345 & 1367 and 31 U.S.C. §§ 3730(b) & 3732(a).

2.      The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts prohibited by federal law occurred in this District.

3.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a).

4.      Respiratory Diagnostics, LLC's claims and this Complaint are not based upon the prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from news media, as enumerated by 31 U.S.C. § 3730(e)(4)(A). To the extent there has been a public disclosure unknown to

Respiratory Diagnostics, LLC, it is the "original source" and the public disclosure is a result of Respiratory Diagnostics, LLC voluntarily providing this information to the United States prior to filing this *qui tam* action. See 31 U.S.C. § 3730(e)(4)(B).

## PARTIES

5.     The Plaintiffs in this *qui tam* action are federal and state governments responsible for the public health insurance programs that are victims of the scheme described here. Hereinafter the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Iowa, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, the State of Wisconsin, and the District of Columbia shall be collectively referred to as the "States."

6.     Plaintiff-Relator Respiratory Diagnostics, LLC, is a federally enrolled independent diagnostic testing facility (IDTF) that specializes in overnight oximetry testing. Respiratory Diagnostics offers its services to physicians and DME companies throughout the United States, and is organized under the laws of the State of South Carolina, with its principal place of business in Columbia, South Carolina.

7.     Defendant VirtuOx, Inc. is a medical technology services company that offers IDTF services and sells home oximetry testing devices to DME suppliers. VirtuOx is a federally enrolled IDTF, eligible for reimbursement by public health insurers. VirtuOx is organized under the laws of the State of Florida, with its principal place of business in Coral Springs, Florida.

8.      Defendant Medical Services of America, Inc. is a Durable Medical Equipment (DME) Supplier organized under the laws of the Commonwealth of Virginia, with its principal place of business in Lexington, South Carolina.

9.      Defendant Apria Healthcare Group, Inc. is a DME Supplier organized under the laws of the State of Delaware with its principal place of business in Lake Forest, California.

10.     Defendant AeroCare Holdings, Inc. is a DME Supplier organized under the laws of the State of Delaware with its principal place of business in Orlando, Florida.

11.     Defendant Preferred Homecare is a DME Supplier organized under the laws of the State of Arizona with its principal place of business in Phoenix, Arizona.

12.     Defendant Rotech Healthcare, Inc. is a DME Supplier organized under the laws of the State of Delaware with its principal place of business in Orlando, Florida.

13.     Defendant American Home Patient is a DME Supplier organized under the laws of the State of Tennessee with its principal place of business in Brentwood, Tennessee.

14.     Defendant Norco, Inc. is a DME Supplier organized under the laws of the State of Idaho with its principal place of business in Boise, Idaho.

## RELEVANT STATUTORY AND REGULATORY AUTHORITY

### The Medicare Program

15.     When Congress passed the Social Security Act of 1965, it created the Medicare Program; a remedial federal health insurance program designed to ensure "adequate medical care is available to the aged throughout this country." Hultzman v. Weinberger, 495 F.2d 1276, 1281 (3d Cir. 1974); see also Title XVIII of the Social Security Act, 42 U.S.C. §§ 426, 426A.

16.     Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Medicare Part D

(Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs. See id. §§ 1395w-101, et seq.

17.    Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A, such as Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) equipment, and supplies, including home oxygen equipment and supplies. See id. §§ 1395j-1395w-6.

18.    The Secretary of Health and Human Services (HHS) is vested with authority to administer the Medicare statute, and operates through the Centers for Medicare and Medicaid Services (CMS), an agency of HHS. 42 U.S.C. § 1395ff(a)(1). Medicare provides coverage for certain types of DME. 42 U.S.C. § 1395k(a). However, "[t]he Medicare statute explicitly provides that 'no payment may be made under … Part B of this subchapter for any expenses incurred for items … [which] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.'" Almy v. Sebelius, 679 F.3d 297, 299 (4th Cir. 2012) (quoting 42 U.S.C. § 1395y(a)(1)(A)).

19.    The determination of whether certain DME is eligible for coverage under Medicare can be made by HHS in a number of ways, including through the issuance of "national coverage determinations" which are not reviewable and are binding throughout the Medicare system. Id. citing 42 U.S.C. § 1395ff(f). Medicare coverage of home use oxygen is addressed by HHS through the Medicare National Coverage Determinations Manual, Publication 100-03, which states:

> Medicare coverage of home oxygen and oxygen equipment under the [DME provisions of the Social Security Act] is considered reasonable and necessary only for patients with significant hypoxemia who meet the medical documentation, laboratory evidence, and health conditions specified in [the CMS Medicare National Coverage Determinations Manual, Publication 100-03, Ch. 1 § 240.2(B)-(D)].

CMS Pub. 100-03, Ch. 1 § 240.2(A).

20.    This coverage criteria is met by completion of Form CMS-484 (Certificate of Medical Necessity, DME 484.3) which details the results of blood oxygen testing and is completed by the patient's treating physician or other clinician, "as long as that person is not the DME supplier." Id. § 240.2(B).

21.    Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

22.    Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services and DMEPOS in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments with Medicare funds. The terms under which DMEPOS is reimbursed by Medicare are set forth generally at 42 U.S.C. § 414, Subpart D.

23.    To participate in Medicare, providers must certify compliance with federal law governing the Medicare Program, which includes compliance with the AKS, before they are permitted to seek reimbursement for products and services.

### The TRICARE/CHAMPUS Program

24.    The Civilian Health and Medical Program for the Uniformed Services known as TRICARE Management Activity (TRICARE/CHAMPUS) provides federal health insurance for active duty members of the armed forces and their families at non-military healthcare facilities. 10 U.S.C. §§ 1971-1106.

25.    TRICARE/CHAMPUS reimburses providers for DMEPOS on the same terms as allowed by CMS's in the Medicare Program. 32 C.F.R. § 199.4(k).

6

26.     To participate in TRICARE/CHAMPUS, providers must certify compliance with federal law, which includes compliance with the AKS, before they are permitted to seek reimbursement for products and services.

## The Medicaid Program

27.     The Medicaid Program is a joint federal-state program that provides health insurance benefits to poor and disabled persons. Medicaid is administered by the states, making federal involvement in the program limited to providing matching funds and ensuring states comply with certain minimum standards for federal financial participation. 42 U.S.C. §§ 1396 et seq.

28.     To receive federal approval, the Medicaid Act mandates seven enumerated medical services. See id. §§ 1396a(a)(10), 1396d(a)(1)-(5), (17), (21). A state may also elect to provide optional medical services. See id. §§ 1396(a)(10)(A), 1396(d)(a). Once a state offers an optional service, it must comply with federal mandates.

29.     DMEPOS is an optional service, unless the recipient qualifies for home health care, in which case it is part of that mandatory service. See id. § 1396a(a)(10)(D); 42 C.F.R. §§ 440.70(a), 440.70(b)(3), 441.15(a)(3) & 440.210(a)(1).

30.     Like Medicare, Medicaid providers certify compliance with state and federal law, including that the information provided is true and correct.

## The Anti-Kickback Statute

31.     The Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b, arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to patients. To protect the integrity of federal health care programs from these difficult-

to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

32.    The AKS makes it a crime to knowingly and willfully offer or pay any remuneration to induce a person "to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering" any good or service reimbursable under a federal health benefits program. 42 U.S.C. § 1320a-7b(b)(2).

33.    Likewise, the AKS makes it a crime to knowingly and willfully receive any such remuneration in exchange for ordering any good or service payable through federal health benefits programs. 42 U.S.C. § 1320a-7b(b)(1).

34.    "Any remuneration" means any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. Id. § 1320a-7b(b)(1).

35.    AKS violations are a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both, and exclusion from federal health care programs for at least five years. See 42 U.S.C. § 1320a-7b. In addition to the statute's criminal penalties, the HHS Secretary has power to impose administrative penalties including exclusion and sanctions of $10,000 per kickback violation. Id. § 1320a-7a.

36.    Compliance with the AKS is a condition of payment by the Medicare program, and violation can result in a participant's exclusion from the program. Id. § 1320a-7(b)(7).

37.     The statute's prohibition against knowing and willful conduct in disregard of the law extends to any arrangement where *one purpose* of the remuneration is to induce referrals. United States ex rel. Westmoreland v. Amgen, Inc., 812 F. Supp. 2d 39, 47 (D. Mass. 2011) (collecting cases).

## The False Claims Act

36.     The False Claims Act (FCA) provides, in relevant part, that:

> any person who--(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; […]
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

37.     FCA liability attaches to claims for payment made to a federal payor arising from a kickback scheme because, (1) since AKS compliance is a material condition of payment, kickback tainted claims are "factually false" within the meaning of the FCA; and (2) health care providers seeking reimbursement for goods and services certify that their submissions comply with the AKS.

38.     Even if a FCA defendant is not responsible for submitting (or presenting) the claim for payment, it is still liable if it causes a third party to submit claims the defendant knows are false within the meaning of the FCA.

39.     In order to be eligible to obtain reimbursement for the sale of DMEPOS from federal health care programs, DME companies, physicians, hospitals, and pharmacies enter into Provider Agreements with CMS in which they certify upon penalty of perjury that:

> I agree to abide by the Social Security Act and all applicable Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Form CMS-855S at p. 23 ¶ 4 (Jan. 2013); see also id. at ¶ 7 ("I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.").

40.     Likewise, to be eligible to obtain reimbursement under the federal health care programs, an IDTF must make an essentially identical certification that it will abide by all rules and regulations, including the federal Anti-Kickback Statute. CMS Form CMS-855B at p. 31 ¶3 (July 2011).

41.     Participation in state Medicaid programs likewise requires a certification of compliance with federal and state anti-kickback laws as a predicate for payment.

42.     Even in the absence of an express certification, the submission of a claim to a federal payor impliedly certifies that the claim is proper for payment such that the submission of a claim tainted by a kickback renders the submitting party's implied certification of compliance false within the meaning of the FCA. See 42 U.S.C. § 1320a-7b(g) (codifying common law doctrine holding violations of the AKS to give rise to false claims); see also, United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243-45 (3d Cir. 2004).

## FACTUAL ALLEGATIONS CONCERNING
## DEFENDANTS' FRAUDULENT CONDUCT

43.     Defendant DME Suppliers are medical equipment companies that, among other things, fill a patient's prescription for in-home oxygen equipment and supplies. The patient's oxygen equipment and supplies are reimbursable by public health insurance programs, but only if its use is supported by a certification of medical necessity establishing that coverage criteria are met and that the oxygen provided by the DME Supplier is consistent with the treating physician's prescription. Proof of medical necessity is frequently established by use of overnight oximetry testing, in which equipment owned by the DME Supplier is used to collect data that is then processed by an IDTF.

44.     VirtuOx is a privately held, CMS approved IDTF that provides at-home testing for the diagnosis and qualification of treatment for sleep disorders, breathing, and respiratory diseases. VirtuOx markets both the pulse oximetry testing hardware worn by the patient during the testing procedure and the diagnostic services required to interpret the data gathered from the equipment.

45.     Once testing is completed, VirtuOx receives reimbursement from public payors at a rate of approximately $24 per test for processing the data collected from the oximetry testing equipment, and the DME Suppliers receive reimbursement for the patient's oxygen equipment and supplies.

46.     Since at least early 2011, and possibly earlier, VirtuOx deliberately sought to corner the IDTF market by taking on the cost of oximetry testing equipment by providing free oximetry equipment to DME Suppliers who, in turn, are required to use VirtuOx services.

47.     While the provision of free equipment is itself an illegal inducement to use VirtuOx diagnostic services, this scheme guarantees a direct quid pro quo requiring DME Suppliers to use VirtuOx services to process data collected using free oximetry equipment. The equipment provided

11

by VirtuOx, which can cost as much as $500 per unit, generates data that can only be processed using proprietary VirtuOx software, so that DMEs have no meaningful choice in which IDTF to use. As explained more fully below, this scheme is designed to expand market share for VirtuOx diagnostic services—reimbursable by public health insurance programs—without regard for patient preference or independent medical judgment.

### Oximetry background

48.     Pulse oximetry testing is a non-invasive procedure used to monitor oxygen levels in the bloodstream. This testing procedure is significantly less expensive and less invasive than blood gas testing in a laboratory setting, which requires a sample of blood to be drawn from the patient. For this reason, pulse oximetry is particularly well suited to determination of a patient's need for medical oxygen to supplement normal breathing.

49.     Oximetry testing equipment itself consists of two parts, a probe that is clipped around a thin, relatively translucent part of the patient's body (typically the fingertip or earlobe), and a recording device attached to the probe by a small wire.

50.     The inside of the probe contains two LED lights on one side which transmit light at two wavelengths (red and infrared) and a sensor on the other side to detect the light. When the sensor is placed on a patient's finger, some of the light is absorbed by the finger and some of the light passes through the finger to be detected by the sensor on the other side.

51.     The amount of light absorbed by the blood flowing through the patient's finger is proportional to the amount of oxygen carrying hemoglobin in the bloodstream, and the manner in which the light is absorbed differs between red light and infrared light. As testing proceeds, the equipment records a series of light absorption measurements over a specified period of time. In order to generate useful medical diagnostic information from these measurements, the data stored

on the oximetry equipment must be processed and ultimately transmitted to the patient's physician for confirmation.

52.     When a patient is prescribed the use of medical oxygen in the home setting, his supply of oxygen and ancillary equipment is provided by a supplier of durable medical equipment such as Defendant DME Suppliers.

53.     The oxygen equipment and supplies are eligible for reimbursement by federal health insurance payors, however, before the DME Supplier can file a claim for reimbursement, oxygen use must be supported by a finding of medical necessity evidenced by conducting arterial blood gas or oximetry testing. CMS Pub. 100-04, Ch. 20 § 100.2.3; see also CMS Pub. 100-03, Ch. 1 § 240.2. The required testing is ordered by the patient's treating physician when he determines that in home oxygen use would benefit the patient.

54.     A typical patient prescribed home oxygen use has the prescription filled by a DME Supplier. The DME Supplier maintains a stock of oximetry testing devices from which it provides equipment to the patient for testing.

55.     However, due to the financial interest a DME Supplier has in the outcome of oximetry testing, CMS imposes strict rules on a DME Supplier "or anyone financially associated with or related to the DME supplier" regarding conduct of oximetry testing. CMS Pub. 100-04, Ch. 20 § 100.2.3(A).

56.     Specifically, CMS requires that the DME Supplier have no participation in instruction or performance of the oximetry testing, and act only as a courier, delivering and retrieving the equipment." CMS Pub. 100-20, Trans. 173 at 2.  The testing itself is to be "performed under the direction and/or instruction of a Medicare-approved IDTF." Id. Following the test, the DME Supplier is allowed to download the test results from the oximetry testing equipment and

transmit those results to the IDTF for analysis, but "[i]n no cases may the DME supplier access or manipulate the test results in any form." Id.

57.    Thus, the DME Supplier controls which oximetry testing devices it purchases and which IDTFs it utilizes for analysis of test results, but it may not analyze the test results itself or utilize "anyone financially associated with or related to the DME supplier[.]" CMS Pub. 100-04, Ch. 20 § 100.2.3(A).

**Plaintiff-Relator Respiratory Diagnostics' Knowledge of the VirtuOx Scheme**

58.    Plaintiff-Relator Respiratory Diagnostics is an IDTF that focuses on oximetry processing for DME Suppliers seeking approval for public health insurance program approval as well as home sleep testing. Because DME companies are only permitted by CMS to act as couriers for oximetry testing equipment, independent diagnostic testing companies such as Respiratory Diagnostics perform a vital service for the industry by providing instructions to the patient on how to complete the test and by processing the results of the test once completed.

59.    The choice of which IDTF will be selected is largely the prerogative of the DME Supplier who, under normal circumstances, is concerned with selecting a IDTF with capacity to process and read test data quickly, accurately, and with a positive customer experience. If a DME Supplier cannot ensure a physician that his patient will have his prescription filled in a timely manner, the physician will likely not continue referring business to that DME Supplier.

60.    The need for timely turnaround on numerous prescriptions requires that a DME Supplier maintain an inventory of numerous oximetry testing devices at each physical location. If a location does not have enough testing equipment to fill prescriptions, patients will be required to wait for the oxygen and potentially have their prescription filled elsewhere.

61.     Thus, the receipt of free oximetry testing equipment—equipment that costs as much as $500 per unit—provides the DME Supplier with a substantial pecuniary benefit by eliminating a necessary business cost and/or allowing it to increase the volume of patients it can service at any one time.

62.     In late 2010, VirtuOx implemented a free oximeter promotional program that offered DME Suppliers free oximetry testing equipment. In return, the DME Suppliers use VirtuOx data processing services, for which VirtuOx is reimbursed by public health insurers.

63.     Beginning in early 2011, the IDTF industry began to see the effects of this newly instituted program as more and more DME Suppliers transitioned their business from IDTFs who did not offer free equipment, such as Respiratory Diagnostics, to VirtuOx.

64.     In September 2011, Amber Watt, the owner and CEO of an IDTF who is a friendly competitor to Respiratory Diagnostics named Breathe, Inc., became aware of the VirtuOx free oximeter program while attempting to become the main IDTF provider for Preferred Home Care. After communicating with representatives for Preferred Home Care, Breathe Inc. was awarded a beta testing site in Mesa, Arizona in anticipation of providing IDTF services through the remaining 95 Preferred Care Locations throughout the United States.

65.     Shortly after beginning service at the Mesa, Arizona site, Breathe, Inc. was contacted by representatives for Preferred Home Care and told that Breathe, Inc. was not going to become their new provider. The reason given to Ms. Watt for the change was that VirtuOx was providing free oximeters, and Preferred Home Care would be doing business with VirtuOx.

66.     This was the beginning of a trend in the IDTF industry that would see DME Suppliers shift the majority of their business to free VirtuOx devices, and necessarily VirtuOx data processing services.

67.    In August 2012, Linda Galphin, CEO and owner of Respiratory Diagnostics, gathered with other industry leaders in Los Angeles, California to discuss issues that they were all having with Apria Health Care. Of the five companies represented at the meeting, all had lost significant business from Apria Health Care to VirtuOx because VirtuOx was offering free oximeters.

68.    Notably, Michael Yedidsion, owner and CEO of a Los Angles based IDTF, OnD Lab, had access to equipment that was technologically comparable to the equipment offered by VirtuOx for free, but he refused to give his equipment away for free because he understood that giving away free equipment would result in a violation of the Anti-Kickback Statute. Instead of violating the AKS he chose not to give his equipment away, and in a June 2016 conversation with Jack Hogan of Respiratory Diagnostics, he informed Mr. Hogan that his business has seen a reduction from doing over 17,000 tests per year to doing less than 7,000 test per year after VirtuOx began offering free oximeters.

69.    In 2014, Respiratory Diagnostics began losing business from one of its major DME Supply partners, Medical Services of America (MSA). In response, Jack Hogan, the corporate clinical coordinator for Respiratory Diagnostics, began communicating with his contacts at MSA to determine the cause of the lost business. He suspected that MSA had been receiving free oximeters from VirtuOx and that MSA was using VirtuOx IDTF services.

70.    In Winter 2014, Mr. Hogan's suspicions were confirmed when he placed a telephone call to Rachel Moore, a staff respiratory therapist for MSA in Newberry, SC. He asked if VirtuOx had given them free oximeters, and she responded "yes" and told him she was sorry that they switched away from Respiratory Diagnostics.

71.    In Fall 2014, Mr. Hogan spoke to an MSA representative for the Rock Hill, SC location by the name of Tony and asked him if they had received free oximeters. Tony told him that the Rock Hill location had received 9 free VirtuOx units and the Monroe, NC location had received 6 units.

72.    Mr. Hogan also spoke with Heather Edwards, a location manager for the Columbia, SC location of MSA, and asked if VirtuOx had given them free oximeters. She told him that they did, and that Cheryl Furr, a regional manager for MSA, had authorized the program.

73.    Later in the Fall of 2014, Jack Hogan and Linda Galphin had an opportunity to visit the Columbia, SC location of MSA and personally saw at least a dozen VirtuOx oximeters on their shelves being charged.

74.    While it was abundantly clear based on Mr. Hogan's conversations that MSA was receiving free oximetry equipment from VirtuOx and transitioning its business from Respiratory Diagnostics to VirtuOx, this scheme was later confirmed by Dr. Robert Galphin, a former medical director for MSA who subsequently joined Respiratory Diagnostics and is their current medical director. During a conversation that occurred in late 2014 between Dr. Galphin and Pete Houchins, a director for MSA, Mr. Houchins told Dr. Galphin that MSA was discontinuing its business with Respiratory Diagnostics because MSA was receiving free VirtuOx devices.

75.    At the time that MSA began transitioning to VirtuOx services, Respiratory Diagnostics was servicing all of the 114 MSA locations, performing approximately 4,000 tests per year. Respiratory Diagnostics currently performs only 1,200 tests per year for MSA, and that number continues to decrease on a monthly basis as MSA's inventory of oximetry testing devices is transitioned to free VirtuOx devices.

76.     Respiratory Diagnostics has lost a significant amount of business from other DME Suppliers as well, all as a result of the VirtuOx free oximeter program.

77.     For example, in Fall 2014 Mr. Hogan spoke with a branch manager for Apria Home Health Care, Angie Legrand, to discuss a decrease in service requests for Respiratory Diagnostics. Ms. Legrand told him that her branches in Sumter and Florence, SC were receiving free oximeters from VirtuOx and that she was operating under instructions from the corporate office.

78.     In the Spring of 2015, Jack Hogan placed a sales call to Jamie Brazier, the branch manager for Aerocare in West Columbia, SC. AeroCare was using Respiratory Diagnostics for overnight oximetry services, and Mr. Hogan sought to encourage them to use Respiratory Diagnostics for other sleep testing services as well. During the conversation, Jack was told that AeroCare uses VirtuOx as well as Respiratory Diagnostics. When Mr. Hogan asked why they used both, he was told that they needed more oximeter devices to handle all of their orders, and that AeroCare would not purchase more equipment. Instead, they accepted the free oximeters from VirtuOx. Ms. Brazier also told Mr. Hogan that they would do more business with Respiratory Diagnostics if they have access to free devices other than VirtuOx devices, because VirtuOx devices can only be interpreted by VirtuOx software.

79.     Finally, in 2015 and in May 2016, Ron Lind, an independent consultant for working for Respiratory Diagnostics in Boise, Idaho discussed with Mr. Hogan that VirtuOx was giving away free oximeters to DMEs throughout the Boise area.

**VirtuOx's free oximeter program is illegal remuneration in violation of the AKS**

80.     VirtuOx has offered free oximetry testing devices to DME Suppliers since at least 2010.

18

81.     As a result of this scheme, Respiratory Diagnostics has lost significant amounts of business from DME Suppliers, all of which is transitioned to VirtuOx. Since 2010, Respiratory Diagnostics estimates that it has lost 200 tests per month from Medical Services of America and 1,500 tests per month from Apria Home Health Care.

82.     Other IDTF companies have lost significant amounts of business as well. Since 2010, OnD Lab estimates that it has lost 800 tests per month from Aerocare and Apria Home Health Care. Breath, Inc. estimates that it has lost 1,950 test per month from Preferred Health Care, 100 tests per month from NORCO, and 300 tests per month from AeroCare to the VirtuOx free oximeter scheme.

83.     Respiratory Diagnostics also received statistics from its software management company, which owns the software used to process the oximetry data. Those statistics indicate a loss of 80,000 tests per year from American Home Patient, Rotech, MSA and, Apria Home Health Care—all of which represent tests that are instead performed under the VirtuOx scheme.

84.     VirtuOx provided valuable medical testing equipment to DME Suppliers who would otherwise be required to purchase the equipment. As such, this equipment is remuneration within the meaning of the AKS.

85.     VirtuOx has knowingly violated the AKS because it knew that providing free oximetry testing equipment was a powerful incentive for DME Suppliers to choose VirtuOx IDTF services, particularly because the equipment provided by VirtuOx can only be processed through VirtuOx software. VirtuOx subsequently sought reimbursement from public insurance programs for testing services tainted by the illegal kickbacks.

86.     Defendant DME Suppliers knowingly participated in the scheme and violated the AKS by accepting free VirtuOx devices. DME Suppliers then submitted claims for reimbursement of home oxygen equipment and supplies based on testing services tainted by the illegal kickbacks.

87.     At least one purpose of this scheme was to increase the volume of claims for reimbursement from public health insurance programs made by both VirtuOx and by DME Suppliers.

88.     This scheme implicates the remedial purpose for which the AKS was adopted by impermissibly influencing DME Suppliers to choose VirtuOx services through strong financial incentives.

89.     Accordingly, this scheme, in which VirtuOx provides free oximetry testing equipment to DME Suppliers who in turn utilize VirtuOx IDTF services, violates the AKS and falls outside of the statutory and regulatory safe harbors, in one or more of the was described above.

90.     Kickbacks are *malem in se* and compliance with the AKS is a material condition for payment by federal health insurance programs.

91.     Both VirtuOx and Defendant DME Suppliers expressly certified AKS compliance when they enrolled to participate in Medicare, TRICARE, and Medicaid and expressly and impliedly certified AKS compliance each time they sought reimbursement.

## COUNT I
## FCA VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[1]

92.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

---

[1] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint also alleges violations of the FCA prior to its recent amendments. See e.g., 31 U.S.C. § 3729(a)(1).

93.    By virtue of the conduct described above, Defendant VirtuOx violated the AKS, 42 U.S.C. § 1320a-7b, by:

        a.    Offering and providing valuable equipment to DME Suppliers for free;

        b.    Requiring DME Suppliers who use VirtuOx oximeters to order VirtuOx services;

        c.    Incentivizing and inducing DME Suppliers to utilize or order Defendant VirtuOx's products and services over competitor products and services;

        d.     In other such ways as discovered during the litigation of this action.

94.    By virtue of the conduct described above, Defendants Medical Services of America, Inc., Apria Healthcare Group, Inc., AeroCare Holdings, Inc.., Preferred Homecare, Rotech Healthcare, Inc., American HomePatient, and Norco, Inc. violated the AKS, 42 U.S.C. § 1320a-7b, by:

        a.    Accepting valuable equipment at no cost in exchange for ordering services that are reimbursed by public health insurance programs;

        b.    In other such was as discovered during the litigation of this action.

95.    This conduct caused false or fraudulent claims for payment to be presented to federal health insurance programs and/or caused materially false records or statements to be made or used to obtain payment from federal health insurance programs.

96.    These false claims include both claims for reimbursement for IDTF testing services as well as claims for reimbursement for provision of oxygen equipment, supplies, and accessories.

97.    Defendants knew that the scheme described above violated the AKS and resulted in the submission of kickback-tainted claims to federal health insurance programs.

98.    In fact, Defendants had actual knowledge that the scheme described above violated the AKS, in part because Plaintiff-Relator made multiple attempts to alert Defendants to the illegal nature of the scheme.

99.     Kickback-tainted claims for payment are materially false and fraudulent and AKS violations are material to whether the Medicare, TRICARE, and Medicaid programs will pay for DME products.

100.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to federally insured patients in the Medicare, TRICARE, and Medicaid programs.

101.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by federal health insurance programs at great cost to federal taxpayers.

102.     Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

**COUNT II**
**CALIFORNIA FALSE CLAIMS ACT VIOLATIONS OF**
**Cal. Gov't Code § 12651(a)(1) &(2)**

103.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

104.     By virtue of the acts described above, Defendants have violated and continue to violate Cal. Bus. & Prof. Code § 650, Cal. Welfare & Inst. Code § 14107.2, and Cal. Health & Safety Code § 445, as amended, prohibiting payment or receipt of bribes or kickbacks.

105.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

106.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

107.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

108.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

109.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

110.    Defendant's conduct is a violation of Cal. Gov't Code § 12651(a)(l) and (2), as amended.

**COUNT III**
**COLORADO MEDICAID FALSE CLAIMS ACT VIOLATIONS**
**OF Colo. Rev. Stat. Ann. § 25.5-4-305**

111.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

112.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

113.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

114.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

115.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

116.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

117.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

118.     Defendant's conduct is a violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(a) & (b), as amended.

### COUNT IV
### CONNECTICUT FALSE CLAIMS ACT VIOLATIONS OF
### Conn. Gen. Stat. Ann. § 17b-301

119.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

120.     By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

121.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

122.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

123.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

124.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

125.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

126.     Defendant's conduct is a violation of Conn. Gen. Stat. Ann. § 17b-301, as amended.

## COUNT V
## DELAWARE FALSE CLAIMS AND REPORTING ACT
## VIOLATIONS OF Del. Code Ann. tit. 6, § 1201 (a)(1) & (2)

127.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

128.    By virtue of the acts described above, Defendants have violated and continue to violate Del. Code Ann. tit. 31 §§ 1005, 1007 & 1008, as amended, prohibiting payment or receipt of bribes or kickbacks.

129.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

130.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

131.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

132.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

133.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

134.    Defendant's conduct is a violation of Del. Code Ann. tit. 6, § 1201 (a)(1) & (2), as amended.

## COUNT VI
## FLORIDA FALSE CLAIMS ACT VIOLATIONS OF
### Fla. Stat. Ann. § 68.082(2)

135.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

136.    By virtue of the acts described above, Defendants have violated and continue to violate Fla. Stat. §§ 456.054 & 409.920, as amended, prohibiting payment or receipt of bribes or kickbacks.

137.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

138.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

139.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

140.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

141.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

142.    Defendant's conduct is a violation of Fla. Stat. Ann. § 68.082(2)(a) & (b), as amended.

## COUNT VII
## GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT
## VIOLATIONS OF Ga. Code Ann. § 23-3-121

143.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

144.     By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

145.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

146.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

147.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

148.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

149.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

150.     Defendants' conduct is a violation of Ga. Code Ann. § 23-3-121(a)(1) & (2), as amended.

## COUNT VIII
## HAWAII FALSE CLAIMS ACT
## VIOLATIONS OF Haw. Rev. Stat. Ann. § 661-21

151.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

152.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

153.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

154.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

155.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

156.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

157.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

158.    Defendants' conduct is a violation of Haw. Rev. Stat. Ann. § 661-21(a)(1) & (2), as amended.

**COUNT IX**
**ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT**
**VIOLATIONS OF 740 Ill. Comp. Stat. Ann. 175/3**

159.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

160.    By virtue of the acts described above, Defendants have violated and continue to violate the 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks), as amended, prohibiting payment or receipt of bribes or kickbacks.

28

161.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

162.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

163.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

164.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

165.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

166.    Defendants' conduct is a violation of 740 Ill. Comp. Stat. Ann. 175/3(a)(1) & (2), as amended.

## COUNT X
## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT VIOLATIONS OF Ind. Code Ann. § 5-11-5.5-2

167.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

168.    By virtue of the acts described above, Defendants have violated and continue to violate Ind. Code Ann. § 12-15-24-2, as amended, prohibiting payment or receipt of bribes or kickbacks.

169.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

170.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

171.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

172.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

173.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

174.    Defendants' conduct is a violation of Ind. Code Ann. § 5-11-5.5-2(b)(l), (2), and (8), as amended.

## COUNT XI
## IOWA FALSE CLAIMS ACT
## VIOLATIONS OF Iowa Code Ann. § 685.2

175.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

176.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

177.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

178.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

179.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

180.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

181.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

182.    Defendants' conduct is a violation of Iowa Code Ann. § 685.2.1.a & b, as amended.

## COUNT XII
## LOUISIANA MEDICAL ASSITANCE PROGRAMS INTEGRITY LAW VIOLATIONS OF La. Stat. Ann. § 46:438.3

183.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

184.    By virtue of the acts described above, Defendants have violated and continue to violate La. Stat. Ann. § 46:438.2, as amended, prohibiting payment or receipt of bribes or kickbacks.

185.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

186.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

187.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

188.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

189.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

190.    Defendants' conduct is a violation of La. Stat. Ann. § 46:438.3A & B, as amended.

## COUNT XIII
## MARYLAND FALSE CLAIMS AGAINST STATE HEALTH PLANS AND STATE HEALTH PROGRAMS ACT
## VIOLATIONS OF Md. Code Ann., Health-Gen. § 2-602

191.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

192.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

193.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

194.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

195.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

196.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

197.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

198.    Defendants' conduct is a violation of Md. Code Ann., Health-Gen. § 2-602 (a)(1) & (2), as amended.

## COUNT XIV
## MASSACHUSETTS FALSE CLAIMS ACT
## VIOLATIONS OF Mass. Gen. Laws Ann. ch. 12, § 5B

199.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

200.    By virtue of the acts described above, Defendants have violated and continue to violate Mass. Gen. Laws Ann. ch. 118E § 41, as amended, prohibiting payment or receipt of bribes or kickbacks.

201.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

202.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

203.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

204.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

205.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

206.    Defendants' conduct is a violation of Mass. Gen. Laws Ann. ch. 12, § 5B(a)(1) & (2), as amended.

## COUNT XV
## MICHIGAN MEDICAID FALSE CLAIMS ACT
## VIOLATIONS OF Mich. Comp. Laws Ann. §§ 400.603, 400.606 & 400.607

207.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

208.    By virtue of the acts described above, Defendants have violated and continue to violate Mich. Comp. Laws §752.1004, as amended, prohibiting payment or receipt of bribes or kickbacks.

209.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

210.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

211.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

212.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

213.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

214.    Defendants' conduct is a violation of Mich. Comp. Laws Ann. §§ 400.603, 400.606 & 400.607, as amended.

## COUNT XVI
## MINNESOTA FALSE CLAIMS ACT
## VIOLATIONS OF Minn. Stat. Ann. § 15C.02

215.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

216.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

217.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

218.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

219.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

220.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

221.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

222.     Defendants' conduct is a violation of Minn. Stat. Ann. § 15C.02(a)(1) & (2), as amended.

## COUNT XVII
## MONTANA FALSE CLAIMS ACT
## VIOLATIONS OF Mont. Code Ann. § 17-8-403

223.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

224.     By virtue of the acts described above, Defendants have violated and continue to violate Mont. Code Ann. § 45-6-313, as amended, prohibiting payment or receipt of bribes or kickbacks.

225.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

226.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

227.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

228.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

229.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

230.    Defendants' conduct is a violation of Mont. Code Ann. § 17-8-403(1)(a) & (b), as amended.

## COUNT XVIII
### NEVADA FALSE CLAIMS ACT
### VIOLATIONS OF Nev. Rev. Stat. Ann. § 357.040

231.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

232.    By virtue of the acts described above, Defendants have violated and continue to violate Nev. Rev. Stat. Ann. § 422.560, as amended, prohibiting payment or receipt of bribes or kickbacks.

233.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

234.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

235.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

236.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

237.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

238.    Defendants' conduct is a violation of Nev. Rev. Stat. Ann. § 357.040.1(a) & (b), as amended.

**COUNT XIX**
**NEW HAMPSHIRE FALSE CLAIMS ACT**
**VIOLATIONS OF N.H. Rev. Stat. Ann. § 167:61-a**

239.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

240.    By virtue of the acts described above, Defendants have violated and continue to violate N.H. Rev. Stat. Ann. § 167:61-a(i), as amended, prohibiting payment or receipt of bribes or kickbacks.

241.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

242.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

243.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

244.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

245.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers. Defendants' conduct is a violation of N.H. Rev. Stat. Ann. § 167:61-a(a)-(d) & (i), as amended.

**COUNT XX**
**NEW JERSEY FALSE CLAIMS ACT**
**VIOLATIONS OF N.J. Stat. Ann. § 2A:32C-3**

246.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

247.    By virtue of the acts described above, Defendants have violated and continue to violate N.J. Stat. Ann. § 30:4D-17, as amended, prohibiting payment or receipt of bribes or kickbacks.

248.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

249.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

250.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

251.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

252.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers. Defendants' conduct is a violation of N.J. Stat. Ann. § 2A:32C-3a-b, as amended.

## COUNT XXI
### NEW MEXICO MEDICAID FALSE CLAIMS ACT
### VIOLATIONS OF N.M. Stat. Ann. § 27-14-4

253.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

254.    By virtue of the acts described above, Defendants have violated and continue to violate N.M. Stat. Ann. § 30-44-7, as amended, prohibiting payment or receipt of bribes or kickbacks.

255.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

256.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

257.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

258.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

259.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

260.    Defendants' conduct is a violation of N.M. Stat. Ann. § 27-14-4A & C, as amended.

## COUNT XXII
### NEW YORK FALSE CLAIMS ACT
### VIOLATIONS OF N.Y. State Fin. Law § 189

261.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

262.    By virtue of the acts described above, Defendants have violated and continue to violate N.Y. Soc. Serv. Law §366-d, as amended, prohibiting payment or receipt of bribes or kickbacks.

263.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

264.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

265.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

266.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

267.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

268.    Defendants' conduct is a violation of N.Y. State Fin. Law § 189.1(a) & (b), as amended.

**COUNT XXIII**
**NORTH CAROLINA FALSE CLAIMS ACT**
**VIOLATIONS OF N.C. Gen. Stat. Ann. § 1-607**

269.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

270.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

271.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

272.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

273.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

274.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

275.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

**276.**    Defendants' conduct is a violation of N.C. Gen. Stat. Ann. § 1-607(a)(1) & (2), as amended.

## COUNT XXIV
## OKALAHOMA MEDICAID FALSE CLAIMS ACT
## VIOLATIONS OF Okla. Stat. Ann. tit. 63, § 5053.1

277.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

278.    By virtue of the acts described above, Defendants have violated and continue to violate Okla. Stat. Ann. tit. 56 § 1005, as amended, prohibiting payment or receipt of bribes or kickbacks.

279.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

280.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

281.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

282.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

283.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

**284.**    Defendants' conduct is a violation of Okla. Stat. Ann. tit. 63, § 5053.1.B.1 & .2, as amended.

**COUNT XXV**
**RHODE ISLAND FALSE CLAIMS ACT**
**VIOLATIONS OF 9 R.I. Gen. Laws § 9-1.1-3**

285.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

286.    By virtue of the acts described above, Defendants have violated and continue to violate 5 R.I. Gen. Laws § 5-48.1-3, as amended, prohibiting payment or receipt of bribes or kickbacks.

287.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

288.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

289.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

290.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

291.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

292.    Defendants' conduct is a violation of 9 R.I. Gen. Laws Ann. § 9-1.1-3(a)(1) & (2), as amended.

**COUNT XXVI**
**TENNESSEE MEDICAID FALSE CLAIMS ACT**
**VIOLATIONS OF Tenn. Code Ann. § 71-5-182**

293.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

294.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

295.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

296.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

297.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

298.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

299.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

300.     Defendants' conduct is a violation of Tenn. Code Ann. § 71-5-182(a)(1)(A) & (B), as amended.

## COUNT XXVII
## TEXAS MEDICAID FRAUD PREVENTION ACT
## VIOLATIONS OF Tex. Hum. Res. Code Ann. § 36.002

301.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

302.     By virtue of the acts described above, Defendants have violated and continue to violate Tex. Hum. Res. Code Ann. § 32.039, as amended, prohibiting payment or receipt of bribes or kickbacks.

303.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

304.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

305.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

306.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

307.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

308.     Defendants' conduct is a violation of Tex. Hum. Res. Code Ann. § 36.002(1), (4), (12) & (13), as amended.

## COUNT XXVIII
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT
## VIOLATIONS OF Va. Code Ann. § 8.01-216.3

309.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

310.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

311.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

312.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

313.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

314.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

315.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

316.    Defendants' conduct is a violation of Va. Code Ann. § 8.01-216.3.A.1 & .2, as amended.

## COUNT XXIX
## WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
## VIOLATIONS OF Wash. Rev. Code Ann. § 74.66.020

317.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

318.    By virtue of the acts described above, Defendants have violated and continue to violate Wash. Rev. Code Ann. § 74.09.240, as amended, prohibiting payment or receipt of bribes or kickbacks.

319.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

320.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

321.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

322.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

323.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

324.    Defendants' conduct is a violation of Wash. Rev. Code Ann. § 74.66.020(1)(a) & (b), as amended.

## COUNT XXX
### WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT
### VIOLATIONS OF Wis. Stat. § 20.931[2]

325.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

---

[2] Because the repeal of the Wisconsin False Claims Act is not retroactive, Defendants' conduct is actionable to the extent it occurred prior to July 2015.

326.    By virtue of the acts described above that occurred prior to repeal of the Wisconsin False Claims for Medical Assistance Act in July 2015, Defendants have violated Wis. Stat. § 20.931, as amended, prohibiting payment or receipt of bribes or kickbacks.

327.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

328.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

329.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

330.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

331.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

332.    Defendants' conduct is a violation of Wis. Stat. § 20.931, as amended.

## COUNT XXXI
### DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT VIOLATIONS OF D.C. Code Ann. § 2-381.02

333.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

334.    By virtue of the acts described above, Defendants have violated and continue to violate D.C. Code Ann. § 4-802, as amended, prohibiting payment or receipt of bribes or kickbacks.

335.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

336.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

337.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

338.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

339.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

340.    Defendants' conduct is a violation of D.C. Code Ann.§ 2-381.02(a)(1) & (2), as amended.

## PRAYER

WHEREFORE, Plaintiff-Relator on behalf of himself, the United States, and the States prays that:

i.      Defendants cease and desist from violating the AKS, the FCA, and their

        state analogs;

ii.     The Court enter judgment against Defendants jointly and severally:

        1.      Awarding an amount equal to three times the damages the
                United States has sustained because of Defendants' conduct,
                plus civil penalties of at least $5,500 to $11,000, adjusted
                upward as specified by applicable law, for each violation of
                31 U.S.C. § 3729;

        2.      Awarding an amount equal to three times the damages the
                State of California has sustained because of Defendants'
                conduct, plus civil penalties of at least $5,500 to $11,000,

adjusted upward as specified by applicable law, for each violation of Cal. Gov't Code § 12651;

3.      Awarding an amount equal to three times the damages the State of Colorado has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Colo. Rev. Stat. Ann. § 25.5-4-305;

4.      Awarding an amount equal to the damages the State of Connecticut has sustained because of Defendants' conduct, plus all penalties allowed by law for each violation of Conn. Gen. Stat. Ann. § 17b-301;

5.      Awarding an amount equal to three times the damages the State of Delaware has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Del. Code Ann. tit. 6, § 1201;

6.      Awarding an amount equal to three times the damages the State of Florida has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Fla. Stat. Ann. § 68.082;

7.      Awarding an amount equal to three times the damages the State of Georgia has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Ga. Code Ann. § 23-3-121;

8.      Awarding an amount equal to three times the damages the State of Hawaii has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Haw. Rev. Stat. Ann. § 661-21;

9.      Awarding an amount equal to three times the damages the State of Illinois has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of 740 Ill. Comp. Stat. Ann. 175/3;

10.     Awarding an amount equal to three times the damages the State of Indiana has sustained because of Defendants'

conduct, plus civil penalties of at least $5,000 for each violation of Ind. Code Ann. § 5-11-5.5-2;

11.    Awarding an amount equal to three times the damages the State of Iowa has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Iowa Code Ann. § 685.2;

12.    Awarding an amount equal to the damages the State of Louisiana has sustained because of Defendants' conduct, plus a civil penalty of at least $10,000 for each violation of La. Stat. Ann. § 46:438.3;

13.    Awarding an amount equal to three times the damages the State of Maryland has sustained because of Defendants' conduct, plus civil penalties of up to $10,000 for each violation of Md. Code Ann., Health-Gen. § 2-602;

14.    Awarding an amount equal to three times the damages the Commonwealth of Massachusetts has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Mass. Gen. Laws Ann. ch. 12, § 5B;

15.    Awarding an amount equal to the damages the State of Michigan has sustained because of Defendants' conduct, plus the maximum civil penalty allowable for each violation of Mich. Comp. Laws Ann. §§ 400.603, 400.606 & 400.607;

16.    Awarding an amount equal to three times the damages the State of Minnesota has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Minn. Stat. Ann. § 15C.02;

17.    Awarding an amount equal to three times the damages the State of Montana has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Mont. Code Ann. § 17-8-403;

18.    Awarding an amount equal to three times the damages the State of Nevada has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000,

adjusted upward as specified by applicable law, for each violation of Nev. Rev. Stat. Ann. § 357.040;

19.    Awarding an amount equal to three times the damages the State of New Hampshire has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $10,000, adjusted upward as specified by applicable law, for each violation of N.H. Rev. Stat. Ann. § 167:61-a;

20.    Awarding an amount equal to three times the damages the State of New Jersey has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of N.J. Stat. Ann. § 2A:32C-3;

21.    Awarding an amount equal to the damages the State of New Mexico has sustained because of Defendants' conduct for each violation of N.M. Stat. Ann. § 27-14-4A & C;

22.    Awarding an amount equal to three times the damages the State of New York has sustained because of Defendants' conduct, plus civil penalties of at least $6,000 to $12,000, adjusted upward as specified by applicable law, for each violation of N.Y. State Fin. Law § 189;

23.    Awarding an amount equal to three times the damages the State of North Carolina has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of N.C. Gen. Stat. Ann. § 1-607;

24.    Awarding an amount equal to three times the damages the State of Oklahoma has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $10,000, adjusted upward as specified by applicable law, for each violation of Okla. Stat. Ann. tit. 63, § 5053.1;

25.    Awarding an amount equal to three times the damages the State of Rhode Island has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of 9 R.I. Gen. Laws Ann. § 9-1.1-3;

26.    Awarding an amount equal to three times the damages the State of Tennessee has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $25,000,

adjusted upward as specified by applicable law, for each violation of Tenn. Code Ann. § 71-5-182;

27.     Awarding an amount equal to three times the damages the State of Texas has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Tex. Hum. Res. Code Ann. § 36.002;

28.     Awarding an amount equal to three times the damages the Commonwealth of Virginia has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Va. Code Ann. § 8.01-216.3;

29.     Awarding an amount equal to three times the damages the State of Washington has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Wash. Rev. Code Ann. § 74.66.020;

30.     Awarding an amount equal to three times the damages the State of Wisconsin has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $10,000, adjusted upward as specified by applicable law, for each violation of Wis. Stat. § 20.931;

31.     Awarding an amount equal to three times the damages the District of Columbia has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of D.C. Code Ann.§ 2-381.02;

32.     Awarding Plaintiff-Relator the appropriate bounty pursuant to 31 U.S.C. § 3730 and the analogous state false claims acts; and

33.     Awarding Plaintiff-Relator attorneys' fees and costs of this action, plus interest, including the costs to the United States and the States for their expenses related to this action;

iii.     That Defendants disgorge all sums by which they have been unjustly enriched by their illegal conduct;

iv.    That the United States, the States, and Plaintiff-Relator receive all relief, both at law and at equity, to which he may reasonably be entitled; and

v.    That the Court order such further relief as it deems just and proper.

**<u>REQUEST FOR TRIAL BY JURY</u>**

Plaintiff-Relator hereby demands a trial by jury.

Respectfully submitted by:

s/Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID No. 1730)
Christopher P. Kenney (Fed. ID No. 11314)
W. Baker Allen (Fed. ID No. 11361)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com
cpk@harpootlianlaw.com
wba@harpootlianlaw.com

ATTORNEY FOR PLAINTIFF-RELATOR
RESPIRATORY DIAGNOSTICS, LLC

August 12, 2016
Columbia, South Carolina.